IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SANDRA RUDZINSKI,          )
                          )
          Plaintiff,      )    Case No. 05 C 0474
                          )
     v.                   )
                          )
METROPOLITAN LIFE INSURANCE )    Magistrate Judge Arlander Keys
COMPANY,                  )
                          )
          Defendant.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra Rudzinski seeks judicial review of Defendant
Metropolitan Life Insurance Company's ("MetLife") decision to
deny her Long Term Disability benefits, under a Disability
Insurance Plan (the "Plan") sponsored by her former employer,
Sharp Electronics Corp. ("Sharp"). The parties have agreed to
resolve this litigation with a trial on the papers, pursuant to
Rule 52(a) of the Federal Rules of Civil Procedure[1]. *See*
*Sullivan v. Bornemann,* 384 F.3d 372, 375 (7th Cir. 2004). For
the reasons set forth below, the Court finds in favor of
Plaintiff, awarding her full benefits[2], prejudgment interest, and
attorneys fees.

The following constitutes the Court's findings of fact and
conclusions of law pursuant to Rule 52(a). To the extent that

---

[1] Defendant initially filed a Motion for Summary Judgment,
but the parties subsequently agreed to proceed under Rule 52(a).

[2] Plaintiff's contractual entitlement to benefits is reduced
by her disability award from the Social Security Administration.

certain factual findings may be deemed to be conclusions of law,
they shall also be considered conclusions of law. Similarly, to
the extent that matters discussed in the conclusions of law may
be deemed findings of fact, they shall be considered findings of
fact.

## FINDINGS OF FACT

Ms. Rudzinski was born on July 1, 1958. She began working
for Sharp in 1997, as a Knowledge Management Content Editor. In
this position, Ms. Rudzinski was responsible for "editing,
proofreading consistency of content, and reporting within the
Knowledge Management System," as well as "editing Standard
Operating Procedures for Knowledge & Information Management and
other departments." MET 784.

Following a lingering viral infection that left her
fatigued, Ms. Rudzinski began seeing an internist in 2001.
Toward the end of 2001 and the beginning of 2002, Ms. Rudzinski's
fatigue worsened, and she developed new symptoms: stiffness in
her joints, urinary frequency, constipation, migraine headaches,
memory loss, extreme motor function difficulty, difficulty
concentrating, irritability, crying spells, low sex drive and
nausea. MET 815, 826, 829, 832-33.

On April 2, 2002, Plaintiff stopped working and submitted to
Sharp a claim for short-term disability ("STD"), pursuant to the
terms of the Plan, which was underwritten by MetLife. Plaintiff

2

claimed that she was unable to perform her job due to the symptoms and ailments described above. Sharp approved her claim, granting her Family and Medical Leave ("FMLA") and paying her STD benefits from April 2, 2002 until June 25,2002. Sharp then placed Plaintiff on a Personal Leave of Absence, effective June 26, 2002 through July 20, 2002. Because Plaintiff was unable to return to work upon the expiration of her Personal Leave of Absence, Sharp terminated her employment, effective July 31, 2002. MET 783.

Sharp suggested that Plaintiff apply for a conversion of her group insurance coverage, in order to maintain long-term disability ("LTD") insurance eligibility. Under the Plan, certain terminated employees may apply to convert their group LTD coverage to individual conversion policies. Notably, the conversion privilege is not available to participants if they are disabled at the time they apply for a conversion policy. MET 675. In order to secure coverage under the individual conversion policy, Plaintiff represented to MetLife that she was not disabled at the time she applied. MET 1511.

On February 7, 2003, Plaintiff applied for long-term disability benefits under the LTD Conversion Plan. MET 712. On May 29, 2003, MetLife informed Plaintiff that she was not eligible for conversion coverage, because she was disabled at the time she completed her conversion application. MetLife advised

3

Plaintiff that it would instead consider her application for benefits under the group policy. MET 704.

On June 17, 2003, Plaintiff filed a claim for LTD benefits under the group policy. Plaintiff claimed that she was entitled to benefits equal to 60% of her monthly salary ($2,334.99/month), commencing after a 180 day elimination period, following the onset of disability on April 2, 2002. MET 779. MetLife denied the claim on July 9, 2003. MetLife's case management specialist, Christine Graf, stated that the sole reason that the claim was being denied was because Plaintiff purportedly did not meet the 180 days of continuous disability for the elimination period; Ms. Graf noted that Plaintiff had received STD for a total of only twelve weeks – far short of the 180-day requirement. MET 81. Notably, Ms. Graf did not explain why receiving only 12 weeks of STD was dispositive of Plaintiff's disability status.

Plaintiff appealed MetLife's denial, supplementing her initial submission with correspondence with Sharp, records of doctor appointments, reports of her condition, and medical evidence. MET 85-92. MetLife denied Plaintiff's claim a second time on January 14, 2004. MET 192-194. Rosemary Harmon, a MetLife Procedure Analyst, explained that Plaintiff neither satisfied the 180-day elimination period nor qualified as an active, eligible Sharp employee, under the terms of the Plan. Met 192-194. MetLife did not reference any of Plaintiff's

4

medical evidence[3] in denying Plaintiff's application for benefits under the Plan. MET 920-922.

In the interim, Plaintiff applied for Disability Insurance Benefits ("DIB") from the Social Security Administration (the "SSA"). MET 612. The claim was denied initially and upon reconsideration, and a requested hearing was held on April 22, 2004. On May 27, 2004, the SSA's Administrative Law Judge ("ALJ") determined that Plaintiff did not retain the residual functional capacity to perform even sedentary work. The ALJ concluded that Plaintiff's fibromyalgia, chronic pain syndrome, and depression had rendered her disabled and unable to perform the requirements of her past relevant work, since April 2, 2002. MET 616. Plaintiff received an award of $1,121.00 per month from the SSA[4].

---

[3] In its Response to Plaintiff's Proposed Findings of Fact, MetLife disingenuously states that the letter informing Plaintiff that MetLife was upholding its denial for benefits stated that "the medical documentation submitted by [Plaintiff's] physicians failed to demonstrate that she was disabled beyond June 25, 2002." The implication that MetLife actually stated that it reviewed any medical evidence is misleading. The letter merely states that "It was noted that none of the medical documentation [that Sharp] *your employer received* from your physicians certified that you were disabled beyond June 25, 2002." MET 921. While this indicates that MetLife was aware that Plaintiff had submitted medical documentation to Sharp in the summer of 2002, it certainly does not support the proposition that MetLife reviewed *any* of the medical evidence in denying Plaintiff's claim.

[4] This award will be offset against benefits from MetLife, leaving a net monthly benefit not to exceed $1,123.49, commencing on October 2, 2002.

5

The attorney who assisted Plaintiff in securing SSA benefits then agreed to assist her in securing LTD benefits from MetLife. Plaintiff's counsel inquired as to whether MetLife utilized a physician to review Plaintiff's application and appeal, as it was required to do under ERISA. MetLife conceded that a physician had not reviewed Plaintiff's file, but claimed that it was not required to do so, because it had denied the application based upon a Plan provision: specifically, that Plaintiff did not meet the Plan's 180-day elimination period requirement. MET 198. In response to a persuasive letter from Plaintiff's counsel, MetLife relented and agreed to provide Plaintiff with one final review of her claim.

Plaintiff submitted a second appeal on August 11, 2004, which included a substantial amount of additional medical evidence, affidavits from Plaintiff's family members, the favorable Social Security determination, and Plaintiff's entire Social Security disability claim file. MET 201-205, 212-625. MetLife hired Dr. Jeffrey Lieberman[5], a rheumatologist, to review Plaintiff's medical file. MET 5-10.

On November 24, 2004, Dr. Lieberman reviewed Plaintiff's file and concluded that "[m]ost patients with fibromyalgia should be able to perform duties of light or sedentary activity. . . . I

---

[5] Dr. Lieberman is affiliated with Network Medical Review, an organization that receives over one million dollars in business annually from MetLife.

6

see nothing in the records specifically to suggest that the claimant would not be able to perform these duties." MET 807. After completing his Physician Consultant Review (the "Review"), Dr. Lieberman then contacted Plaintiff's treating physician, Dr. Dzamashvili, regarding Plaintiff's condition. Dr. Lieberman's notes indicate that Dr. Dzamashvili stated that "he himself would probably be able to continue to work with [Plaintiff's] level of reported impairment. . . . He did agree that she should not do anything more than light duty activities." MET 808.

Despite the fact that Dr. Lieberman's notes of his conversation with Dr. Dzamashvili contradict every one of Dr. Dzamashvili's written statements regarding Plaintiff's ability to work, MetLife accepted Dr. Lieberman's statements and relied upon his conclusions in denying Plaintiff's second appeal. MET 803. And while Dr. Lieberman's notes briefly mention that he had received the records from many of Plaintiff's treating physicians, neither Dr. Lieberman nor MetLife mention the SSA's determination that Plaintiff was disabled in reaching their disability determinations.

Plaintiff's counsel confirmed with MetLife that the denial of Plaintiff's second appeal constituted MetLife's final determination, and Plaintiff filed suit against MetLife on January 26, 2005. On October 6, 2005, Plaintiff filed a two-count Amended Complaint against MetLife and Sharp, respectively.

In Count I, Plaintiff seeks redress for MetLife's denial of her claim for benefits under the Plan. In Count II, which Plaintiff voluntarily dismissed on January 4, 2006, Plaintiff alleged that Sharp had interfered with her ability to obtain benefits and misled her into applying for the Conversion Policy.

## Significant Plan Provisions

Sharp acquired from MetLife a Long-Term Disability Benefits Policy (the "Policy") to underwrite the Long-Term Disability Insurance Plan ("Plan") that Sharp offers its employees. The Plan is an employee welfare benefit plan operated on behalf of Sharp's employees and governed by ERISA.

The Policy provides for the payment of long-term monthly disability benefits for employees participating in the Plan, in the event they become totally disabled. Sharp was named Plan Administrator under the Policy. MetLife was named the Plan fiduciary in the Certificate of Insurance (the "Certificate") issued with the Policy. The Certificate states that "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract." MET 17.

The Plan grants fiduciaries discretionary authority to determine eligibility for benefits and to construe the terms of the Plan. The Plan states that "in carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret

8

the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." MET 77.

The Plan defines "Disabled or Disability" as follows: "Disabled or Disability means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and treatment from a Doctor on a continuing basis; and 1. during your Elimination period and the next 24 month period you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in you Local Economy." MET 38.

The Plan defines the term "own occupation" as follows: "'Own Occupation' means the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other Employer." MET 39, 662.

Under the terms of the Plan, Sharp paid short-term disability benefits to qualifying inactive, disabled employees during a 180 day policy benefits elimination period (the "elimination period"). Upon the expiration of the elimination

9

period, MetLife was to pay long-term disability benefits to employees found to be "disabled," under the terms of the Plan.

## Medical Evidence

On April 2, 2002, Plaintiff filed an application for STD benefits with Sharp, which was supported by a report from her psychiatrist, Dr. Lance Holemon. Dr. Holemon indicated on a STD benefits form that Ms. Rudzinski should be able to return to work by April 23, 2002. MET 346. At that time, however, her physicians were not certain what was causing Plaintiff's symptoms. Although her attending physician, Dr. Ryan, could find no objective evidence of a disability, Dr. Ryan concluded that Plaintiff was unable to work due to extreme fatigue, diarrhea, and poor concentration, due to post-viral fatigue and depression. MET 347.

On May 28, 2002, Plaintiff consulted with **Dr. James Lengemann**, who was seeing Dr. Ryan's patients while Dr. Ryan was on maternity leave. Dr. Lengemann noted that Plaintiff was requesting a short-term disability extension. MET 132. After examining Ms. Rudzinski, Dr. Lengemann noted that he found nothing abnormal, but he told Plaintiff that he would continue her short-term disability until her work-up was complete. MET 132-33. Plaintiff returned to Dr. Lengemann on June 12, 2002. Plaintiff's CT Scan of her head and sinuses were essentially normal. Dr. Lengemann also noted that Dr. Ryan denied telling

10

Ms. Rudzinski that her post viral illness fatigue could last up to two years. MET 154. However, Dr. Lengemann stated that he was "interested in working up her fatigue aggressively and have sent her to a neurologist." MET 154. He also diagnosed her with migraines and prescribed Midrin, noting that "if it does not resolve tomorrow 100% she is to call us and we will refer her to neurology ASAP or make appropriate changes at that time." MET 155.

Plaintiff returned to Dr. Lengemann again on June 19, 2002, and he noted that "patient is here with continued fatigue. She needs form filled out for her short term disability. She did see Dr. Dzamashvili, Neurology, for migraine headaches." MET 151. Dr. Lengemann further noted that all of Plaintiff's test results were normal, but that Plaintiff's situation was "difficult" and that he needed to "continue to work up the etiology." MET 152. Dr. Lengemann further stated that he was unable to specify a date when Plaintiff could return to work, because there was "no objective evidence as to the etiology of her fatigue, that the only symptoms we have to go on are her assessments." MET 152. Finally, Dr. Lengemann noted a conflict of interest between his desire to identify the cause of Plaintiff's fatigue and his perception that Plaintiff wished to avoid any diagnosis that might negatively affect her disability claim. MET 151-156.

Plaintiff first saw **Dr. Konstantin Dzamashvili**, a neurologist, on June 14,2002. Dr. Dzamashvili noted that she suffered from atypical migraines and that an "MRI of brain revealed multiple foci of increased signal in per ventricular white matter, consistent with possible demyelinating process." MET 729.

On August 14, 2002, Dr. Dzamashvili noted "pain in all extremities and the body." "Also has increased pain in the lower back." "Still with double vision." He diagnosed Plaintiff with headaches, migraines, and fibromyalgia. MET 728-729. Dr. Dzamashvili examined Plaintiff again on September 25, 2002, and November 13, 2002, and noted that Plaintiff's symptoms had persisted. MET 245.

On November 29, 2002, Dr. Dzamashvili completed a Report advising MetLife that Plaintiff was unable to work due to fibromyalgia and migraine headaches. MET 222. Dr. Dzamashvili also completed a narrative report, accompanied by a detailed assessment of functional capacity. This report listed Plaintiff's physical restrictions and limitations, which precluded her from performing her job or from engaging in any sedentary occupation. In this Report, Dr. Dzamashvili stated that Plaintiff lacked the capacity to meet the requirements of sedentary employment, as that term is used by both the Social Security Administration and the Department of Labor. MET 223-226.

For example, Dr. Dzamashvili found that Plaintiff would have to miss work 75% of the time due to her fibromyalgia, headaches and chronic pain syndrome; that Plaintiff would not be capable of using her hands for repetitive work related activities; that Plaintiff's pain and fatigue were severe; that Plaintiff experiences frequent, severe cognitive problems; and that Plaintiff could sit continuously for only 40 minutes, stand for only 10 minutes and walk for only 5 minutes.

Dr. Dzamashvili completed a detailed headache report on April 5, 2004, documenting the nature, characteristics, and severity of Plaintiff's migraine headaches. MET 235-239. He reported that Plaintiff suffered from migraine headaches with associated symptoms, such as vertigo, nausea, vomiting, malaise, photosensitivity, visual disturbance, mood changes, and mental confusion/inability to concentrate. He also noted that her headaches were worsened by bright lights, coughing, straining, moving about, and noise.

Dr. Dzamashvili treated Plaintiff again on January 29, 2003, and noted that she continued to suffer from migraine headaches and fibromyalgia. He also noted that she suffers from chronic pain syndrome, memory problems, and a balance disorder, which results in falling.

On February 2, 2003, Dr. Dzamashvili completed a LTD Attending Physician Report for MetLife, which reaffirmed the

13

diagnosis of fibromyalgia and migraines, and then listed all of Plaintiff's medications. He stated that Plaintiff could only sit, stand, or walk for a total of one hour intermittently; that she is able to occasionally lift or carry less than ten pounds; that she is unable to repetitively use her upper extremities; and that she is unable to climb, twist/bend/stoop, reach above shoulder level, or operate a motor vehicle. Dr. Dzamashvili concluded that Plaintiff could not return to work, because her condition is chronic.

Throughout 2003, Dr. Dzamashvili continued to note pain and numbness in Plaintiff's left leg, headaches/migraines, problems with memory, confusion, problems with speech, fibromyalgia, chronic pain syndrome, falling/tripping, depression and disequilibrium. Plaintiff began using a cane, and was taking the following medications: Provigil, Tagamet, Paxil, Neurontin, Klonpin, Topamax, Trazdone, Amerge, and Bextra.

Shortly after he began treating Plaintiff, Dr. Dzamashvili referred her to **Dr. Gogoneata**, a rheumatologist. MET 735. In a letter to Dr. Dzamashvili dated September 6, 2002, Dr. Gogoneata found that Plaintiff was experiencing pain and swelling in her hands, stiffness the entire day, lower back pain, pain in knees and hips, and occasional numbness in her feet. Dr. Gogoneata noted that Plaintiff was treated with steroids, but discontinued them due to the numerous side effects. Plaintiff was taking

14

Neurontin, Opamax, Paxil, Clonopin, Zanaflex, and Trazodone. MET 732.

Most importantly, Dr. Gogoneata diagnosed Plaintiff with fibromyalgia, finding that Plaintiff had "positive trigger points present." Dr. Gogoneata also stated that Plaintiff's back pain was suggestive of osteoarthritis. She further found that Plaintiff was suffering from trochanteric bursitis, for which she injected Plaintiff's left knee and right trochanteric bursae with 40 mg and 20 mg of Triamcinolon, respectively. MET 733.

Plaintiff saw **Dr. Ward** at the Institute of Personal development numerous times, beginning in July of 2002, for her extreme fatigue, sleepiness, pain, anxiety, and depression. MET 387-398, 295-300. She continued to see Dr. Ward until April of 2003, when she was experiencing memory loss, forgetfulness, and fibromyalgia. MET 387-389, 393, 398.

To assess her double vision, Plaintiff saw **Dr. Patricia Davis**, a neuro-ophthalmologist, on September 16, 2002. Dr. Davis diagnosed Plaintiff with diplopia, which is vertical and "double vision secondary to possible complicated migraine." MET 227, 410. She noted that Plaintiff suffered from "right fourth cranial nerve palsy, which she states happened during a severe bout of migraines." MET 227. To treat the condition, Dr. Davis placed a "Fresnel prism over one eye" and saw her again two weeks later. In a letter to Dr. Dzamashvili dated February 3, 2004,

15

Dr. Davis stated that Plaintiff suffers from "right hypertropia and some right 4th nerve palsy which is a little unusual" and "paralysis of up-gaze." MET 240.

On November 6 and 7 of 2002, Plaintiff saw **Dr. Laura Jansons**, a clinical psychologist, for a psychological evaluation, at the request of the Social Security Administration. Dr. Jansons reported that Plaintiff had complaints of fibromyalgia, arthritis, and migraine headaches. MET 302. The mental status exam revealed poor short term memory, concentration, and attention span. She concluded that Plaintiff "does display weakness with verbal recall, remote memory, associate learning, and auditory processing." MET 304. Dr. Jansons recommended that Plaintiff "not return to her most recent job, she seems unable to maintain the cognitive focus required. Her cognitive capacity is affected by depression, pain and medications." MET 304.

## Family Member Statements

Plaintiff also submitted to MetLife witness statements from her husband, daughter, and son. Joseph Rudzinski, Plaintiff's husband since 1995, stated that, although Plaintiff loved her job at Sharp, her chronic pain, fatigue, migraines, and problems with constipation and diarrhea forced her to stop working in April of 2002. He explained that Plaintiff's memory is deteriorating, that she is unable to do most of the household chores, that she is incapable of even paying bills or balancing their checkbook,

16

and that most medications offered her, at best, only short-term relief. MET 213.

Plaintiff's daughter, Stacey Filip, stated that her mother was unable to sit in the car long enough to visit her in college. She explained that her mother only has the energy to perform one main activity - such as cooking, going to a doctor's appointment, using the computer, etc. -each day, before she succumbs to pain and exhaustion. Stacey also stated that Plaintiff's mental abilities have become impaired. Stacey described Plaintiff's speaking and writing as slow and disorganized, and explained that her mother frequently forgets what her purpose was in the middle of a task. MET 215. Nicholas Filip, Plaintiff's son, confirmed that Plaintiff's health took a serious turn for the worse, when he left for college in 2001-2002. MET 217.

## CONCLUSIONS OF LAW

### A. MetLife's Obligations Under ERISA

This suit comes to the Court pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001, et seq. (West 2007). Congress enacted ERISA to "promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disability Plan v. Nord.,* 538 U.S. 822, 830 (2003). "ERISA and the Secretary of Labor's regulations under the Act require a 'full and fair' assessment of claims and clear

17

communication to the claimant of the 'specific reasons' for benefit denial." *Id*.

Under ERISA, an insurance company must abide by certain minimum standards when processing disability claims. 29 U.S.C. 1133. "[S]pecific reasons for denial [must] be communicated to the claimant and . . . the claimant [must] be afforded an opportunity for 'full and fair review' by the administrator." *Nord*, 538 U.S. at 825. The "full and fair review" requirement imposes upon fiduciaries the obligation to inform the claimant of the evidence the decision-maker relied upon; to afford the claimant with the opportunity to address the accuracy and reliability of that evidence; and to consider the evidence presented by the claimant prior to issuing a decision on the claim. *Brown v. Retirement Comm. Of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 534 (7th Cir. 1986). The relevant ERISA provisions provide that plan administrators must:

> 1)provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> 2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

29 U.S.C. § 1133 (West 2007).

The regulations further describe the Plan's obligations when denying a claim, explaining that the notice of denial must:

18

1) give specific reasons for the denial; 2) reference the plan provision on which the denial is based; 3) describe any additional material or information necessary for the claimant to perfect the claim and explain why such material or information is necessary; and 4) provide appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review. 29 C.F.R. § 2560.503-1(f). "In determining whether a plan complies with the applicable regulations, substantial compliance is sufficient." *Halpin v. Grainger, Inc.,* 962 F.2d 685, 690 (7th Cir. 1992).

## B. Standard of Review

Under ERISA, "[a] denial of benefits will be reviewed *de novo* 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Ruiz v. Continental Casualty Co.,* 400 F.3d 986, 989 (7th Cir. 2005). If the Plan vests a plan fiduciary with discretion to make benefits determinations, those determinations will be overturned only if they are found to be arbitrary and capricious. *Perugini-Christen v. Homestead Mortgage Co.,* 287 F.3d 626 (7th Cir. 2002) (To determine the appropriate standard of review in an ERISA action, the Court must look to the specific Plan language); *see also, Rud v. Liberty Life Assurance Co. Of Boston,* 438 F.3d 772, 774 (7th Cir. 2006); *Ruiz,* 400 F.3d at 990.

19

Plaintiff concedes that the Plan vests Plan fiduciaries and administrators with the requisite discretion, but contends that MetLife's decision is not entitled to review under the arbitrary and capricious standard, because MetLife is not identified by name as a fiduciary in the Plan documents, citing *Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 870-71 (7ᵗʰ Cir. 2006) (no discretionary review because, although the Certificate of Insurance conferred discretionary review, the Certificate specifically stated that it was "not the Policy") As such, Plaintiff argues, the Court must review MetLife's denial under the traditional *de novo* standard. *Id.*

The Court disagrees, finding *Sperandeo* readily distinguishable. In *Sperandeo* "neither the Certificate nor the policy contain[ed] language incorporating the Certificate into the policy." 460 F.3d at 870. To the contrary, the *Sperandeo* Certificate explicitly stated that it was *not* the Policy, but merely evidence thereof. *Id.* at 871.

Conversely, in the case at bar, the contract between Sharp and MetLife states that the parties' agreement includes "this policy, including all Exhibits," MET 632[6], and the Schedule of

---

[6] At MET 632, Sharp and MetLife's contract further states: **"Certificates.** MetLife will issue certificates to the Policyholder for delivery to each Covered Person, as appropriate. Such certificate will describe the Covered Person's benefits and rights under this policy. 'Certificate' includes any of MetLIfe's insurance riders, notices or other attachements to the

Exhibits lists the Certificate. MET 634. The Certificate of Insurance expressly provides MetLife with the discretion to interpret the terms, conditions, and provisions of the parties' agreement and the Group Policy specifically incorporates the Certificate (MET 627, 641). *See Ruiz*, 400 F.3d at 991 (finding that both an insurance policy and a certificate of insurance were "plan documents" for purposes of determining the appropriate standard of review.) The Plan Certificate states that: "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract." MET 627, 641; *see McAfee v. Metro. Life Insurance Co.*, 2006 WL 1455431, at *4 (E.D.Ca. May 24, 2006) (interpreting identical language to find that the arbitrary and capricious standard applied). Thus, the Court rejects Plaintiff's contention that *Sperandeo* controls, and finds instead that the Plan Certificate constitutes a "plan document" conferring upon MetLife the requisite discretion to trigger the arbitrary and capricious standard of review. *See Ruiz*, 400 F.3d at 870 (finding that the arbitrary and capricious standard applied where the certificate gave the insurance company the requisite discretion).

Moreover, because MetLife actually performs the fiduciary function of determining benefits eligibility, MetLife is considered to be a fiduciary under the Plan. *Rud v. Liberty Life*

---

certfiicate."

21

*Assurance Co. of Boston,* 438 F.3d 772 (7ᵗʰ Cir. 2006) (where policy granted insurer authority to construe terms of policy and to determine benefit eligibility, the insurer is an ERISA fiduciary); *Ruiz v. Continental Casualty Co.,* 400 F.3d 986, 990 ("The measure of whether a person is a fiduciary is not whether that person is formally designated as such. Instead, a fiduciary should be viewed 'in functional terms of control and authority over the plan.'")

Plaintiff next argues that, even if the arbitrary and capricious standard applies, the Court must consider evidence of MetLife's clear conflict of interest in determining whether MetLife abused its discretion. *Firestone Tire and Rubber Co v. Bruch,* 489 U.S. 101, 115 (1989). Plaintiff claims that MetLife operated under an inherent conflict, because its obligations to its stockholders to maximize profits is a fiduciary obligation in direct tension with its fiduciary obligation under ERISA to act exclusively in the interest of plan participants. 29 U.S.C. § 1104(a)(1); *See Torres v. Unum Life Ins. Co. Of Amer.,* 405 F.3d 670, 679-80 (8ᵗʰ Cir. 2005) (in the face of discretionary plan language, *de novo* review is appropriate only where the plaintiff identifies a serious procedural irregularity, and evidence showing that the irregularity has "some connection to the substantive decision reached.")

22

However, the Seventh Circuit has found that an administrator's fiduciary obligations to its stockholders and plan participants are complimentary, and do not create an inherent conflict of interest. In *Mers v. Marriott Intern. Group Accidental Death and Dismemberment Plan,* the Seventh Circuit stated that:

> [I]t is a poor business decision to resist paying meritorious claims for benefits. Companies . . . that sponsor ERISA plans are customers who choose which group insurance policies they will use to fund their plans. . . [T]hese employers want to see their employees' claims granted because they want their employees satisfied with their fringe benefits. These corporate employers have the sophistication and bargaining power necessary to take their business elsewhere if an insurer . . . consistently denies valid claims. In the long run, this type of practice would harm an insurer by inducing current customers to leave and by damaging its chances of acquiring new customers.

144 F.3d 1014, 1021 (7th Cir. 1998). The *Mers* court rejected the plaintiff's argument that a heightened standard of review should be applied, and instead confirmed that it would reverse the denial of benefits only if the decision was arbitrary and capricious[7]. *Id.*

Similarly, this Court rejects Plaintiff's contention that a heightened level of review should be applied in the instant case. Absent evidence of specific facts indicating that the conflict

---

[7] Nevertheless, courts have held that, while this purported conflict does not alter the standard of review, "the judicial inquiry is more searching." *Ladd v. ITT Corp.,* 148 F.3d 753, 754 (7th Cir. 1998).

23

caused a serious breach of MetLife's fiduciary obligations,
Plaintiff's inherent conflict of interest argument must fail.[8]

Plaintiff further argues that the Court should apply a
heightened standard of review because MetLife's consultative
physician, Dr. Jeffrey Lieberman, is affiliated with Network
Medical Review, an organization that does millions of dollars a
year in business with MetLife. MetLife attacks Plaintiff's
attempt to introduce evidence regarding Dr. Lieberman and Network
Medical Review, because: 1) the evidence regarding Dr. Lieberman
is beyond the scope of the administrative record and may,
therefore, not be considered; and 2) Plaintiff failed to disclose
Dr. Lieberman and the documentation describing Network Medical
Review's relationship with MetLife in her Rule 26 disclosure.

MetLife's first argument requires little discussion. Courts
generally allow claimants to offer evidence outside of the
administrative record for the limited purpose of demonstrating a
fiduciary's alleged conflict of interest. *See, e.g., Alford V.
DCH Foundation Group Long Term Life Ins. Co.,* 144 F. Supp.2d
1183, 1210 (C.D. Cal. 2001).

Turning to MetLife's second objection, the Court disagrees
that Rule 37(c) automatically bars consideration of the evidence.

_____

[8] While MetLife bears the burden of proving that the
arbitrary and capricious standard should apply in the first
instance, Plaintiff must demonstrate that a conflict of interest
warrants abandoning deferential review.

24

Under Rule 37(c) of the Federal Rules of Civil Procedure, a party that fails to disclose information required by Rule 26(a), is generally barred from using such evidence at trial. *Dunkin' Donuts Inc. V. N.A.S.T., Inc.* 428 F. Supp.2d 761, 771 (N.D. Ill. 2005). However, Rule 37(c)(1)'s exclusion sanction does not apply if the offending party can show that "its violation of Rule 26(a) was either justified or harmless." *Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 742 (7th Cir. 1998). In determining whether a Rule 26(a) violation is justified or harmless, courts consider: 1) the prejudice or surprise to the nonoffending party; 2) the ability of the offending party to cure the prejudice; 3) the likelihood of disruption at trial and 4) whether the failure to disclose involved bad faith or willfulness. *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003).

In this case, MetLife does not and cannot argue that it was unaware that Dr. Lieberman would be called as a witness in this case. Nor can MetLife seriously contend that it was unfairly surprised when confronted with evidence of Dr. Lieberman's and Network Medical Review's relationship with MetLife. Nevertheless, the Court finds that Plaintiff's reference to one court case discussing Network Medical Reviews professional affiliation with MetLife is insufficient to alter the standard of review in this case. *Williams v. Aetna Life Ins. Co.,* No. 04 C 6228, 2006 WL 2794969, at *9 (N.D.Ill. Sept. 28, 2006)(the fact

25

that the defendant's medical consultant "was paid for reviewing [the claimant's] medical records does not render his report suspect."); *Semien v. Life Ins. Co. Of North America,* 436 F.3d 805, 814 (7th Cir. 2006) (compensating physicians for consulting services is not, in and of itself, sufficient to establish a palpable conflict of interest.)

## C. MetLife's Decision to Deny Benefits Was Arbitrary & Capricious

Having determined that the arbitrary and capricious standard applies, the Court will defer to MetLife's decision to deny benefits unless it is "downright unreasonable." *Ruiz,* 400 F.3d at 989; *Trombetta v. Cragin Federal Bank for Sav. Employee Stock Ownership Plan,* 102 F.3d 1435, 1438 (7th Cir. 1996) (an ERISA benefits' decision is arbitrary and capricious "only when the decisionmaker has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence . . ., or is so implausible that it could not be ascribed to a difference in view or the product of . . . expertise.") In reviewing disability determinations, courts consider the "impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally

26

the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1344 (7th Cir. 1995).

Even under this deferential standard, however, review is not "a rubber stamp and deference need not be abject." *Hackett v. Xerox Corp., Long-Term Disability Income Plan,* 315 F.3d 771, 774 (7th Cir. 2003). ERISA requires fiduciaries to identify the basis for their decisions, and courts will not uphold a fiduciary's finding "when there is an absence of reasoning in the record to support it." *Id.* at 774-75; *Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 919 (7th Cir. 2003) (finding for the claimant despite the deference of the arbitrary and capricious standard, because there were "mere scraps" of evidence supporting the defendant's denial.)

After a thorough review of the Record, the Court concludes that MetLife failed to conduct a full and fair review of Plaintiff's claim. From the outset, MetLife seemed predisposed to denying Plaintiff's claim in the most expeditious manner possible. Initially, MetLife shirked its ERISA obligations by having non-medical personnel curtly determine that Plaintiff did not qualify for benefits under the terms of the Plan, without any meaningful review of the medical evidence submitted by Plaintiff. When confronted with its lapse by Plaintiff's counsel, MetLife begrudgingly agreed to another review, this time with the assistance of Dr. Lieberman.

In rejecting Plaintiff's claim that she was disabled, Dr. Lieberman mentioned, but did not discuss, dispute, or distinguish, the reports by the numerous physicians that supported Plaintiff's claim that she was unable to work. Instead of analyzing this evidence in forming his conclusions, Dr. Lieberman relied upon: 1) impermissible generalizations about the capabilities of the majority of fibromyalgia sufferers; 2) the absence of objective tests to validate the severity of Plaintiff's fibromyalgia, despite the fact that such tests do not exist; and 3) the most negative inference from Dr. Dzamashvili's purported statement that Plaintiff was not capable of more than light work.

Similarly, in denying Plaintiff's claim, MetLife rejected, without discussion, numerous competent records from physicians who actually examined Plaintiff, and, apparently, ignored entirely the SSA's determination that Plaintiff was disabled and the witness statements describing Plaintiff's steadily deteriorating health. Against this substantial evidence of disability, MetLife chose to credit Dr. Lieberman's flawed Physician Review to bolster its decision that Plaintiff was not disabled[9]. Under these circumstances, the Court can only

_____

[9] MetLife has abandoned its argument that Plaintiff was not entitled to benefits under the terms of the Plan because she was not an "eligible" employee and/or because she did not satisfy the 180-day elimination period; MetLife neither mentioned those factors in its final rejection letter to Plaintiff nor raised

28

conclude that MetLife's LTD benefits decision was arbitrary and capricious. *Hawkins,* 326 F.3d at 919 (reversing the insurer's decision when the "record contains nothing more than scraps to offset the evidence" in the claimant's favor).

## 1. **MetLife's Reasons For Rejecting Plaintiff's Final Appeal Were Arbitrary and Capricious**

In the December 8, 2004 letter denying Plaintiff's final appeal, MetLife stated that Plaintiff did not qualify for benefits because: 1) Dr. Lieberman's Review found that she could perform sedentary or light work, rendering her capable of working as a Knowledge Management Content Editor; 2) from April 2, 2002 until June 17, 2002, there was no objective medical evidence supporting that Plaintiff was under any kind of medical care, or that Plaintiff's ailments were so severe as to preclude her from working; and 3) Plaintiff's file lacked objective testing to support Plaintiff's claim that her depression, fibromyalgia, pain, and vision problems were disabling. MET 803. The Court finds that the reasons set forth by MetLife are logically unsound and do not provide a valid basis for rejecting Plaintiff's LTD application.

### a. **Reliance Upon Dr. Lieberman's Physician's Review, to the Exclusion of Other Evidence, Was Unreasonable**

Since it was discovered in June of 2002 that Plaintiff was suffering from fibromyalgia, both her treating physician and the

---

these arguments in its Response or Surreply briefs.

SSA consulting psychiatrist agreed that she was unable to return to work. None of the physicians who examined Plaintiff stated that she was capable of working, or offered opinions on her abilities that would support such a conclusion. Despite this, MetLife relied upon the opinion of its own hired consultant, who never examined Plaintiff and apparently reviewed only a select portion of Plaintiff's submissions, to conclude that Plaintiff was not entitled to LTD.

Admittedly, a fiduciary acting under ERISA -unlike an ALJ reviewing a claim under the Social Security Act- is not required to accord special deference to the opinions of treating physicians. *Kobs v. United Wis. Ins. Co.,* 400 F.3d 1036, 1039 (7ᵗʰ Cir. 2005). As the Supreme Court explained in *Black & Decker Disability Plan v. Nord,*:

> Plan administrators, of course, *may not arbitrarily refuse to credit a claimant's reliable evidence,* including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit *reliable* evidence that conflicts with a treating physician's evaluation.

538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (emphasis added.)

But while the fiduciary need not give special weight to the opinions of the claimant's treating physicians, "it may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *Glenn v. MetLife,* 461 F.3d 660, 671 (6ᵗʰ

30

Cir. 2006). Moreover, "[t]he denial of LTD benefits may be arbitrary and capricious when the decision is based on a conclusion by a non-examining physician who did not examine the entire record and discounted relevant medical evidence." *Lawrence v. Life Insurance Company of North America*, No. 06 C 6094, 2007 WL 2410180, at * 9 (N.D. Ill. Aug. 20, 2007); *see also Carugati v. Long Term Disability Plan for Salaried Employees*, No. 01 C 5863, 2002 WL 441479, at *6 (N.D. Ill. Mar. 21, 2002) (fiduciary's denial based upon a consulting physician's report, which selectively cited to the record, is arbitrary and capricious).

In *Ladd v. ITT Corp.*, 148 F.3d 753, 754 (7th Cir. 1998), like the case at bar, a plan relied upon a negative report by a consulting physician, despite the fact that both the claimant's treating physicians and an ALJ for the SSA found that the claimant was disabled. The Seventh Circuit determined that the plan's decision to deny the plaintiff's claim and rely on the consulting physician's report was arbitrary and capricious, because the consulting physician did not provide any reasons for disagreeing with the plaintiff's physicians and the ALJ. *Id.*

Here, in concluding that Plaintiff was capable of performing light work, Dr. Lieberman made no attempt to distinguish the myriad of medical evidence supporting Plaintiff's claim. Plaintiff's treating physician, Dr. Dzamashvili, has consistently

31

labeled Plaintiff's condition as disabling, providing a number of reports detailing the debilitating nature of her fibromyalgia, migraines and chronic pain syndrome. See MET 220-221, 223-226, 235-239. Dr. Dzamashvili's fibromyalgia diagnosis was supported by the conclusions of rheumatologist Dr. Gogoneata, who confirmed that Plaintiff suffers from fibromyalgia, MET 732-733, and his migraine diagnosis was supported by neuro-ophthalmologist Dr. Davis. MET 240. Dr. Laura Jansons, a clinical psychologist who evaluated Plaintiff on behalf of the SSA, concluded that Plaintiff's cognitive capacity had been negatively affected by depression, pain, and medications, and recommended that Plaintiff not return to work. MET 304. The SSA evaluated all of Plaintiff's medical evidence and agreed that Plaintiff was, in fact, disabled from performing even sedentary work.

Like Dr. Lieberman in his review, MetLife made no attempt to explain why it was rejecting these physicians' findings, and made no mention whatsoever of the SSA's determination, when informing Plaintiff that her final appeal was being denied. Instead, it curtly informed Plaintiff that Dr. Lieberman, a physician who had never examined Plaintiff and apparently reviewed only a portion of the file, determined that she was capable of performing her former position and, therefore, her application was being denied. MetLife's decision to credit Dr. Lieberman's Physician's Review, to the exclusion of all evidence supporting Plaintiff's claim, is

particularly troubling, because the Court finds that Dr.
Lieberman's Review was wholly unreliable. See, e.g.,
Govindarajan v. FMC Corp., 932 F.2d 634 (7th Cir. 1991) (a plan's
selective review of the medical evidence to justify a denial of
benefits is arbitrary and capricious).

Dr. Lieberman based his opinion on a selective review of the
evidence, neglecting to distinguish the parade of medical
opinions and test results that support Plaintiff's claim of
disability. See Glenn v. MetLife, 461 F.3d 660, 671 (6th Cir.
2006) ("the plan administrator need not accord special deference
to the opinion of a treating physician. By the same token, it
may not arbitrarily repudiate or refuse to consider the opinions
of a treating physician.") Moreover, Dr. Lieberman did not
consider Plaintiff's favorable SSA determination; he relied upon
the most negative inference from his purported conversation with
Dr. Dzamashvili; and he improperly discredited Plaintiff's claims
regarding the severity of her pain, because of the absence of
nonexistent, objective tests and because of his perception of
what most people with fibromyalgia can do. This last error was
his most egregious.

The Seventh Circuit specifically discredited as unpersuasive
a physician's disability opinion that was based upon his
perception of what the majority of fibromyalgia suffers could do,
and upon the lack of objective evidence confirming disabling

pain. In *Hawkins v. First Union Corporation Long-Term Disability Plan*, the court explained the impropriety of relying upon generalizations about fibromyalgia, stating that:

"There is no serious doubt that Sarchet is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether Sarchet is one of the minority. . . .' **The fact that the majority of individuals suffering from fibromyalgia can work is the weakest possible evidence that [the claimant] can,** especially since the size of the majority is not indicated; it could be 50.00001 percent.

326 F.3d 914, 916 and 919 (7ᵗʰ Cir. 2003)(emphasis added) (quoting *Sarchet v. Chater,* 78 F.3d 305, 306-07 (7ᵗʰ Cir. 1996).)

The *Hawkins* court was also deeply troubled by the importance that the insurance company's physician placed on the lack of objective tests to substantiate the extent of the claimant's pain. The court explained that the severity of the pain experienced by persons diagnosed with fibromyalgia cannot be documented by objective tests; the only evidence regarding the severity of the pain is the claimant's subjective statements. *Id.* ("Pain often and in the case of fibromyalgia cannot be detected by laboratory tests. The disease itself can be diagnosed more or less objectively by the 18-point test . . . ., but the amount of pain and fatigue that a particular case of it produces cannot be.") Accepting the insurance company's physician's

34

position, i.e., that fibromyalgia is not disabling absent
objective evidence of the severity of the pain, would mean that
fibromyalgia could never be shown to be totally disabling, which
is improper. *Id. at 916-918.* Similarly, Dr. Lieberman's decision
to discredit Plaintiff's evidence on this basis is improper.

Next, the fact that MetLife failed to provide Dr. Lieberman
with Plaintiff's SSA file, and Dr. Lieberman's selective review
of the evidence he did receive, further undermine the probative
value and reliability of his Physician's Review.    Dr.
Lieberman's Review indicates that he reviewed only office notes
by ophthalmologist Dr. Patricia Davis, the rheumatologic
evaluation by Dr. Gogomeata, a vaguely described category of
laboratory tests, a June 2, 2002 CAT scan, records from Dr.
Dzamashvili, records from Dr. Lengemann, and a neuropsych test by
Dr. Laura Jansons.    Noticeably absent from Dr. Lieberman's list
of reviewed materials is Plaintiff's SSA file, as well as the
SSA's determination that Plaintiff was disabled.

As discussed more thoroughly below, MetLife's failure to
provide Dr. Lieberman with (or otherwise consider) Plaintiff's
SSA file and determination is further evidence that MetLife's
review was arbitrary and capricious.    Interestingly, Dr. Jansons'
neuropsych test, which Dr. Lieberman did review, was part of
Plaintiff's SSA file.    And even though Dr. Lieberman mentions the
test, he cites to Dr. Jansons' findings selectively.    For

example, Dr. Lieberman mentions Dr. Jansons' finding that Plaintiff was "'in the average range of intellectual functioning,' no statistical 'strengths or weaknesses emerged.'" But he entirely neglects to mention Dr. Jansons' conclusion that Plaintiff: 1) should "not return to her most recent job, she seems unable to maintain the cognitive focus required. Her cognitive ability is affected by depression, pain and medications"; and 2) "does display weakness with verbal recall, remote memory, associate learning, and auditory processing.[10]" MET 304.

The Court was also struck by the fact that Dr. Lieberman's Review spent as much time discussing Dr. Lengemann's June 2002 evaluation as he did all of Dr. Dzamashvili's records. Clearly, the evidence furnished by Dr. Dzamashvili was more relevant. Plaintiff had a short and somewhat frustrating relationship with Dr. Lengemann, from April until June of 2002-- *prior to her fibromyalgia diagnosis.* Dr. Lengemann's notes reveal his skepticism of Plaintiff's subjective claims of pain, largely because he was unable to verify them objectively. Notably, Dr. Lengemann never tested Plaintiff for fibromyalgia.

Conversely, Dr. Dzamashvili treated Plaintiff for years, beginning in June of 2002. Dr. Dzamashvili was the first

---

[10] Dr. Lieberman does cite to Dr. Jansons' diagnosis that Plaintiff suffers from major depression and generalized anxiety disorder.

36

physician to diagnosis Plaintiff with fibromyalgia- a diagnosis
that was confirmed by tender spots/trigger evaluation performed
by Rheumatologist Dr. Elea Gogoneata in September of 2002.  Dr.
Dzamashvili also diagnosed Plaintiff with migraines, a diagnosis
supported by Dr. Patricia Davis's finding that Plaintiff suffered
from diplopia, which is vertical and "double vision secondary to
possible complicated migraine."  MET 227, 410.  And yet Dr.
Lieberman's Review glosses over Dr. Dzamashvili's findings of
severe and debilitating pain, and does not attempt to reconcile
his own conclusions with Dr. Dzamashvili's records supporting
Plaintiff's claim of a disability[11].

---

[11]    In addition to the slanted reliance upon Dr.
Dzamashvili's "aberrational" oral statement, Dr. Lieberman's
Review seems to go out of its way to casually undermine
Plaintiff's claim.  Dr. Lieberman's somewhat cursory Review took
time to note that Plaintiff failed to follow up with
"ophthalmology," as recommended by Dr. Lengemann; this hardly
seems relevant when Dr. Lieberman clearly knew that Plaintiff
received testing and treatment from Dr. Davis, a neuro-
ophthalmologist.  The Review also lists a number of tests and
labs that came back as "normal," but these tests merely ruled out
ailments that were not relevant to and did not undermine
Plaintiff's claim that her fibromyalgia, migraines, and chronic
pain rendered her disabled.  And while Dr. Lieberman's Review
carefully listed the numerous tests that ruled out irrelevant,
unclaimed ailments, he failed to mention more relevant testing
that supported Plaintiff's claim.  For example, Dr. Lieberman's
Review does not discuss the results from Plaintiff's sleep study,
which illustrated that Plaintiff was experiencing periodic leg
movements that disturbed her sleep, with frequent micro arousals
of unknown etiology and excess alpha activity.  The results from
the sleep study are consistent with Plaintiff's claim of non-
restorative sleep and fatigue, and they constitute objective
evidence consistent with a diagnosis of fibromyalgia.  *See Monroe
v. Pacific Telesis,* 971 F. Supp. 1310 (C.D. Cal. 1997) (noting
the significance of sleep studies with respect to fibromyalgia.)

Dr. Lieberman did contact Dr. Dzamashvili, just after completing his Review. Dr. Lieberman's Addendum indicates that Dr. Dzamashvili stated that: 1) he would likely be able to work with Plaintiff's reported levels of pain; and 2) he agreed that Plaintiff could do no more than light duty activities. Despite ignoring Dr. Dzamashvili's written statements in his Review, Dr. Lieberman was all too ready to jump on Dr. Dzamashvili's purported statements undermining Plaintiff's claim for LTD benefits.

Initially, the Court notes that Dr. Dzamashvili's statement that Plaintiff could not do more than light duty work is not tantamount to stating that Plaintiff is capable of doing light duty work. More importantly, however, to accept these statements as evidence that Dr. Dzamashvili believed that Plaintiff could do light duty work contradicts every medical record and report submitted by Dr. Dzamashvili. *See, e.g.,* MET 220-221 (2/2/2003 LTD Attending Physician Report for MetLIfe finding that Plaintiff is unable to work because her condition is chronic); MET 223-226 (11/29/2002 Narrative Report and detailed assessment of functional capacity identifying Plaintiff's restrictions and limitations, which would preclude her from performing even sedentary work); MET 235-238 (4/5/2004 Headaches Residual Functional Capacity Questionnaire, noting that Plaintiff was "precluded from performing even basic work activities," that

Plaintiff was incapable of tolerating even "low" work stress, and that Plaintiff would miss work more than three times per month due to her impairments.)

MetLife attempts to explain the apparent contradiction by arguing that Dr. Lieberman's conversation with Dr. Dzamashvili occurred in 2004 — more than two years after her initial diagnosis— and that Plaintiff was steadily improving. Nothing in the Record supports MetLife's claim that Dr. Dzamashvili believed Plaintiff's condition was improving. To the contrary, Dr. Dzamashvili never wavered from his finding that Plaintiff's condition was chronic. Dr. Dzamashvili completed the Headaches Residual Functional Capacity Questionnaire -- where he noted that Plaintiff's chronic impairments rendered her unable to perform even sedentary work-- in April of 2004. This is utterly inconsistent with MetLife's argument that Dr. Dzamashvili believed Plaintiff's condition was improving in 2003 and 2004[12].

---

[12] Even accepting MetLife's improbable argument, it would not negate the fact that Dr. Dzamashvili found Plaintiff to be disabled at least through April 5, 2004, entitling her to benefits through at least that period. The Plan requires that Plaintiff prove that she was disabled through the Elimination Period and the next 24-month period. MET 38, 661. Based on Plaintiff's April 2, 2002 date of disability, her elimination period would run through September 29, 2002,. The Court finds it unreasonable to conclude, based upon Dr. Lieberman's purported conversation with Dr. Dzamashvili, that although he found Plaintiff's condition to be chronic and totally disabling as late as April of 2004, and although the SSA found Plaintiff to be disabled from April 2, 2002 through at least May of 2004, that Plaintiff's condition so improved that she suddenly was able to work by September 29, 2004 (the expiration of the 24 month

Dr. Lieberman's and MetLife's reliance upon this single purported oral opinion, and their rejection of Dr. Dzamashvili's multiple written opinions further illustrates the unreasonableness of their decisions. *See Glenn,* 461 F.3d at 669 ("[t]hat information is so inconsistent with other medical evidence and detailed reports by [the treating physician] over a period of three years that it can best be described as aberrational."); *Hatter v. Raytheon Co.,* No. 3:06CV-308-H, 2007 WL 855233, at \*2-3 (W.D. Ky. March 15, 2007) (finding arbitrary and unreasonable insurer's decision to credit one, aberrational oral statement that was contrary to the physician's numerous written reports.)

## b. **MetLife's Statement that Plaintiff was not Receiving Medical Care and Failed to Supply Objective Evidence That Her Fibromyalgia was Debilitating is Erroneous**

MetLife's second basis for denying Plaintiff's application is even less supportable. MetLife's contention that Plaintiff was not under "any kind of medical care" between April 2002 and June 17, 2002 is flatly contradicted by the Record. On April 2, 2002, Plaintiff's psychiatrist, Dr. Lance Holemon stated that Plaintiff was disabled and unable to return to work until April 23, 2002. MET 346. Plaintiff's treating physician, Dr. Ryan, noted that Plaintiff had been suffering from ongoing symptoms

---

period) so as to render her ineligible for benefits, or by November 24, 2004, when Dr. Lieberman spoke to Dr. Dzamashvili.

since November of 2001, and opined that Plaintiff would not be able to return to work until June 2, 2002. MET 347. Shortly thereafter, Dr. Ryan left for maternity leave, and Plaintiff saw her colleague, Dr. Lengemann, on May 28, June 12, and June 19 of 2002. Dr. Lengemann was unable to identify what was causing Plaintiff's symptoms, and referred her to a neurologist and an opthomalogist. Notably, Plaintiff sought treatment from both a neurologist and an opthomalogist[13].

In light of this evidence, to say that Plaintiff was not receiving medical care during this time period is preposterous. Clearly, Plaintiff was actively seeking medical testing and treatment for her as of then unknown condition. The fact that her physicians were unable to determine that Plaintiff was suffering from fibromyalgia until Dr. Dzamashvili tested for it in July of 2002 does not negate the fact that Plaintiff was suffering prior to her diagnosis. MetLife's position fails to account for the nature of fibromyalgia:

> fibromyalgia, also known as fibrositis [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are

---

[13] Plaintiff did not, however, go to the specialists to whom she was referred by Dr. Lengemann. MetLife makes much of the fact that Plaintiff lied to Dr. Lengemann about why she did not see his physicians. In light of the clearly contentious relationship between Plaintiff and Dr. Lengemann, the Court finds that the lie evinces nothing but Plaintiff's desire to break ties with Dr. Lengemann without a confrontation.

41

entirely subjective. There are no laboratory tests for the
presence or severity of fibromyalgia. The principal symptoms
are pain all over, fatigue, disturbed sleep, stiffness, and-
the only symptom that discriminates between it and other
diseases of a rheumatic character-multiple tender spots,
more precisely 18 fixed locations on the body (and the rule
of thumb is that the patient must have at least 11 of them
to be diagnosed as having fibromyalgia) that when pressed
firmly cause the patient to flinch.

*Sarchet,* 78 F.3d at 306-07. Her physicians' initial failure to
diagnose her with this "elusive and mysterious" disease until
July of 2002 is not evidence that Plaintiff was not suffering
from a disability in April through June of 2002. That is
particularly true in the instant case, where the evidence shows
that Plaintiff was steadfastly searching for a diagnosis and
treatment plan during that time.

    For similar reasons, the Court finds untenable MetLife's
argument that Plaintiff was not entitled to LTD benefits because
her file lacked objective testing to support the conclusion that
her depression, fibromyalgia, pain, and vision problems were
disabling. The Seventh Circuit has repeatedly stated that, once
a physician has confirmed that a patient has fibromyalgia, there
are no objective tests to determine the severity of the
condition. *See Sarchet 78 F.3d at 306-07; Hawkins,* 326 F.3d at
916 (noting that fibromyalgia can be diagnosed objectively, but
the severity of the fibromyalgia symptoms cannot be determined
objectively.) MetLife's insistence that Plaintiff provide
documentation that she cannot possibly produce demonstrates both

a fundamental misunderstanding of the disease and the unreasonableness of its determination.

## 2. **MetLife's Failure to Account for the SSA's Disability Award Renders Its Decision Arbitrary and Capricious.**

MetLife's denial of Plaintiff's final appeal did not mention at all the Social Security Administration ALJ's determination that Plaintiff had been disabled since April 2, 2002. In response to Plaintiff's argument that this "oversight" is evidence that MetLife's decision is arbitrary and capricious, MetLife argues only that the cases cited by Plaintiff are distinguishable[14]. The Court disagrees. While elements of these cases may be distinguished on certain grounds, MetLife cannot avoid the bevy of authority holding that a fiduciary's failure to even consider the SSA's timely finding of disability is evidence that its decision is arbitrary and capricious. *See, e.g., Ladd,* 148 F.3d at 753-754.

The Court acknowledges that a plan is not required to accept a Social Security Administration adjudication of disability as binding on it, particularly where the definitions of disability

---

[14] *Halpin v. WW Grainger, Inc.* 962 F.2d 685, 695 n.11 (7th Cir. 1992) ("although the standards used in adjudicating social security cases are not applicable under ERISA, the guiding principles developed in those cases may be instructive in ERISA cases.") *LaBarge v. Life Insurance Co. Of North America,* 2001 WL 109527, at *8 (N.D. Ill. Feb. 6, 2001) ("The findings of the Social Security Administration are compelling evidence of a plaintiff's disability. A social security decision may be considered by a court reviewing a claim for disability benefits under the Employment Retirement Income Security Act of 1974.")

43

under federal law and the plan in question are different. See *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.,* 230 F.3d 415, 419-20 (1st Cir. 2000). Nor is a plan required to defer to treating physicians in the manner required of an ALJ in a Social Security case. See *Nord,* 538 U.S. at 825. But that does not mean that the Social Security Administration's determination provides no relevant evidence in support of a claimant's application for LTD. See *Pari-Fasano,* 230 F.3d at 420.

If MetLife had discounted this evidence because of a differing definition of disability, or a differing level of deference to treating physicians, MetLife could easily have stated this to Plaintiff in its denial letter. Its failure to do so, and the fact that it apparently did not even provide Dr. Lieberman with Plaintiff's full SSA file, indicates that the evidence was not considered at all. See *Bard v. Boston Shipping Ass'n,* 471 F.3d 229, 242 n. 17 (1st cir. 2006).

An ERISA plan administrator's failure to address the SSA's finding that a claimant is totally disabled is an indication that the plan's denial of LTD benefits is arbitrary and capricious. *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 295 (6th Cir. 2005) In *Calvert,* a case remarkably similar to this one, the plan administrator relied almost exclusively on the recommendation of a hired physician consultant, who conducted a file review but not a physical examination of the claimant. See

*Id.* The Sixth Circuit found that the plan's review was clearly inadequate, because the plan not only overlooked medical evidence supporting the claimant's application, but also because the plan failed to mention the Social Security Administration's determination. *Id.* at 296 ("not ... even to discount or disagree with it, which indicates that he may not even have been aware of it."); *see also, Glenn*, 461 F.3d at 669 ("That MetLife apparently failed to consider the Social Security Administration's finding of disability in reaching its own determination of disability does not render the decision arbitrary *per se,* but it is obviously a significant factor to be considered upon review.")

The evidence shows that Plaintiff notified MetLife of the SSA's disability determination well before its final review of Plaintiff's LTD application. Yet there is no indication in the Record that MetLife considered the SSA's determination in denying Plaintiff's claim. The Court concludes that MetLife's failure to address the SSA's DIB award is further evidence that MetLife's decision was arbitrary and capricious.

## 3. **Procedural Irregularities Further Demonstrate MetLife's Failure to Provide Plaintiff with a Full and Fair Review**

Under the Plan, MetLife agreed that "the person who will review your appeal will not be the same person who made the decision to deny your claim." MET 76. This is consistent with ERISA regulations passed to ensure full and fair review for claimants. In assuring a full and fair review for plan

45

participants, ERISA regulations require that no deference be given to the initial decision, that the review be conducted by someone other than the initial reviewer, that someone trained and experienced in the appropriate field of medicine be consulted, and that a different consultant be involved in advising on the review. 29 C.F.R. § 2560.503-1(h)(3)(ii) and (iii). In this case, however, Christine Graf, a MetLife case management specialist, initially denied Plaintiff's claim, and then denied Plaintiff's final appeal.

There are other examples of procedural irregularities, as well. Contrary to ERISA's requirements, MetLife failed to have medical personnel review Plaintiff's first or second submissions. *Martin v. Metropolitan Life Ins. Co.,* 2002 WL 32072618, at*7 (E.D.Va. Sept. 23, 2002) (noting that plans must have a physician or nurse consultant review a claimant's application for benefits). It was only when Plaintiff's counsel highlighted MetLife's failure to comply with its ERISA obligations that MetLife finally hired a physician to review Plaintiff's file. MET 198. The Court finds that these procedural irregularities constitute additional evidence that MetLife's decision was arbitrary and capricious.

## D. Remand Is Not Necessary

After reviewing the evidence in this case, the Court concludes that Remand is unnecessary. *Fritcher v. Health Care*

*Svc Corp.*, 301 F.3d 811, 818 (7ᵗʰ Cir. 2002). "Where there is no evidence in the record to support a termination or denial of benefits" a retroactive award of benefits is appropriate. *DiPietro v. Prudential Ins. Co. Of Am.*, 2004 WL 626818, at *11 (N.D. Ill. 2004); *See also, Govindarajan v. FMC Corp.*, 932 F.2d 634, 637 (7ᵗʰ Cir. 1991) (an insurer's irregular and selective review of claimant's application warranted the imposition of benefits without remand). The evidence so strongly favors Plaintiff's entitlement to LTD benefits, and so strongly demonstrates MetLife's refusal to provide Plaintiff with a full and fair review of her claim, that remand and a retroactive award of benefits is appropriate.

In addition, the Court finds that Plaintiff's attorney is entitled to his Attorneys's Fees. "The Court in its discretion may allow a reasonable attorney's fee and cost of action to either party." 29 U.S.C. § 1132(g)(1). In deciding whether to award attorney's fees to the prevailing party, the Court must decide whether the losing party's position was justified and taken in good faith. *Bowerman v. Wal Mart Stores, Inc.*, 226 F.3d 574, 592 (7ᵗʰ Cir. 2000); *Wyatt v. Unum Life Ins. Co. Of Am.* 223 F.3d 543, 547 (7ᵗʰ Cir. 2000). MetLife's utter disregard for the evidence favoring Plaintiff's claim[15] and its selective citation

---

[15] MetLife's denial letter to Plaintiff makes no mention of the findings by several physicians that Plaintiff's ailments rendered her unable to work. *See, e.g.,* MET 223-226 (Dr.

to the Record[16] in this litigation weigh heavily in favor of awarding Plaintiff's reasonable fees and costs. *Hess v. Hartford Life & Acc. Ins. Co.,* 274 F.3d 456, 464 (7th Cir. 2001) (award of fees and costs was appropriate where the defendant's termination of benefits was arbitrary and capricious); *See also, Bowerman v. Wal-Mart Stores, Inc.,* 226 F.3d 574, 592 (7th Cir. 2000) (noting that there is a modest presumption that the prevailing party in an ERISA case is entitled to fees).

---

Dzamashvili's 11/29/2002 Narrative Report and detailed assessment of functional capacity identifying Plaintiff's restrictions and limitations, which would preclude her from performing even sedentary work); MET 304 (Dr. Jansons's November 6-7, 2002 mental status conclusion that Plaintiff should "not return to her most recent job, she seems unable to maintain the cognitive focus required.") Similarly, MetLife never mentioned the SSA's finding that Plaintiff is disabled, despite the fact that Plaintiff forwarded to MetLife her entire SSA file prior to her final appeal.

[16] Consistent with MetLife's arbitrary treatment of the evidence supporting Plaintiff's LTD application, MetLife's Response brief frequently makes incomplete and misleading references to evidence in the Record. For example, in ¶ 50 of its Response Brief, MetLife states that Plaintiff filed a claim for DIB with the SSA, and that the claim was denied. While this is true, MetLife makes no move to correct the inference that the SSA never awarded Plaintiff benefits; following a hearing before an ALJ, Plaintiff was awarded DIB from the SSA on May 27, 2004. Similarly, in ¶¶ 51 and 52 of its Response brief, MetLife cites selectively to Dr. Jansons' notes to create the inference that Dr. Jansons believed that Plaintiff was merely looking for assistance in seeking disability benefits, and that Dr. Jansons concluded only that Plaintiff "is performing in the average range of intellectual functioning. No statistical strengths or weaknesses emerged." MetLife's Response at 17. MetLife conveniently glosses over Dr. Jansons' conclusion that Plaintiff lacks the cognitive focus to perform in her former position. MET 304.

48

## CONCLUSION

For the reasons set forth in this Memorandum Opinion and Order, the Court finds in favor of Plaintiff Sandra Rudzinski, and against Defendant, Metropolitan Life Insurance Company, for monthly payments due under the terms of the Plan, as well as all back payments, plus prejudgment interest, and reasonable attorney's fees and court costs, once these amounts are computed.

DATE: September 14, 2007          ENTERED

_Arlander Keys_
ARLANDER KEYS
United States Magistrate Judge