IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANDRA RUDZINSKI, | ) |
| | ) |
| Plaintiff, | ) Case No. 05 C 0474 |
| | ) |
| v. | ) |
| | ) |
| METROPOLITAN LIFE INSURANCE COMPANY, | ) Magistrate Judge Arlander Keys |
| | ) |
| Defendant. | ) |

| | |
|---|---|
| SHARP ELECTRONICS CORPORATION, | ) |
| | ) |
| Cross-Plaintiff | ) |
| | ) Case No. 05 C 0474 |
| v. | ) |
| | ) Magistrate Judge Arlander Keys |
| METROPOLITAN LIFE INSURANCE COMPANY, | ) |
| | ) |
| Cross-Defendant | ) |

**MEMORANDUM OPINION AND ORDER**

Currently before the Court is Cross-Plaintiff, Sharp Electronics Corporation's ("Sharp") Motion to Disqualify Mandell Menkes, LLC, the law firm currently representing Defendant and Cross-Defendant Metropolitan Life Insurance Company ("MetLife"). For the reasons set forth below, Sharp's Motion is Denied.

**BACKGROUND FACTS**

In 1997, Sharp purchased from MetLife a group disability income insurance policy("the Policy"), as part of its ERISA-provided "employee welfare benefit plan" ("the Plan.") The Policy provided for the payment of monthly, long-term disability

benefits for eligible employees found to be totally "disabled," as defined by the Policy. At all relevant times, Sharp was the Plan administrator, and MetLife was a fiduciary under the Plan. Pursuant to the terms of the Plan, Sharp was required to pay short-term disability benefits to disabled employees during a 180-day elimination period. Thereafter, MetLife was to pay long-term disability benefits to disabled employees.

Plaintiff Sandra Rudzinski began working for Sharp in 1997, as a Knowledge Management Content Editor. Following a lingering viral infection that left her fatigued, Ms. Rudzinski began seeing an internist in 2001. Toward the end of 2001 and the beginning of 2002, Ms. Rudzinski's fatigue worsened, and she developed new symptoms: stiffness in her joints, urinary frequency, constipation, migraine headaches, memory loss, extreme motor function difficulty, difficulty concentrating, irritability, crying spells, low sex drive, and nausea. MET 815, 826, 829, 832-33.

On April 2, 2002, Plaintiff stopped working and submitted to Sharp a claim for short-term disability ("STD"), pursuant to the terms of the Disability Insurance Policy, which was underwritten by MetLife. Plaintiff claimed that she was unable to perform her job due to the symptoms and ailments described above. Sharp approved her claim, granting her Family and Medical Leave ("FMLA") and paying her STD benefits from April 2, 2002 until

2

June 25, 2002. Sharp then placed Plaintiff on a Personal Leave of Absence, effective June 26, 2002 through July 20, 2002. Because Plaintiff was unable to return to work upon the expiration of her Personal Leave of Absence, Sharp terminated her employment, effective July 31, 2002. MET 783.

Sharp suggested that Plaintiff apply for a conversion of her group insurance coverage, in order to maintain long-term disability ("LTD") insurance eligibility. Under the Plan, certain terminated employees may apply to convert their group LTD coverage to individual conversion policies. Notably, the conversion privilege is not available to participants if they are disabled at the time they apply for a conversion policy. MET 675. In order to secure coverage under the individual conversion policy, Plaintiff represented to MetLife that she was not disabled at the time she applied. MET 1511.

On February 7, 2003, Plaintiff applied for long-term disability benefits under the LTD Conversion Plan. MET 712. On May 29, 2003, MetLife informed Plaintiff that she was not eligible for conversion coverage, because she was disabled at the time she completed her conversion application. MetLife advised Plaintiff that it would instead consider her application for benefits under the group policy. MET 704.

On June 17, 2003, Plaintiff filed a claim for LTD benefits under the group policy. MetLife denied the claim on July 9,

2003. MetLife's case management specialist, Christine Graf, stated that the sole reason that the claim was being denied was because Plaintiff purportedly did not meet the 180 days of continuous disability for the elimination period; Ms. Graf noted that Plaintiff had received STD for a total of only twelve weeks – far short of the 180-day requirement. MET 81. Notably, Ms. Graf did not explain why receiving only 12 weeks of STD was dispositive of Plaintiff's disability status.

Plaintiff appealed MetLife's denial, supplementing her initial submission with correspondence with Sharp, records of doctor appointments, reports of her condition, and medical evidence. MET 85-92. MetLife denied Plaintiff's claim a second time on January 14, 2004. MET 192-194. Rosemary Harmon, a MetLife Procedure Analyst, explained that Plaintiff neither satisfied the 180-day elimination period nor qualified as an active, eligible Sharp employee, under the terms of the Plan. Met 192-194.

In its communications with Plaintiff- prior to the initiation of this lawsuit- MetLife never mentioned the non-payment of insurance premiums as a roadblock to Plaintiff's ability to secure benefits under the Plan. The first time MetLife formally raised the issue, apparently, was in a letter prepared by MetLife's attorney, Michael Rakov of Mandell Menkes, in anticipation of a September 12, 2005 settlement conference.

4

On September 7, 2005, Mr. Rakov wrote to Ms. Rudzinski's attorney and asserted that "Sharp's decision not to continue her leave of absence beyond [July 31, 2002] or to pay her disability premiums meant that she failed to qualify for any extension of any Plan coverage or benefits. MetLife therefore properly denied Ms. Rudzinski her request for benefits under the terms of the Plan." MET 1520, Ex. C to Sharp's Mot. to Disq. at p. 5. At the settlement conference, Mr. Rakov again stated that Sharp's failure to pay insurance premiums on Ms. Rudzinski's behalf after her termination rendered her ineligible for Plan benefits[1]. *See* Declaration of Mark DeBofsky, ¶ 4.

Shortly after the settlement conference, Ms. Rudzinski moved for leave to file an Amended Complaint, naming Sharp as an additional defendant. In support of her allegations against Sharp, Ms. Rudzinski cited the defense asserted by Mr. Rakov on behalf of Metlife. On October 31, 2005, MetLife filed its Answer to the Amended Complaint, and reiterated its position that the non-payment of premiums contributed to Ms. Rudzinski's ineligibility for benefits.

Sharp pressed MetLife to withdraw its assertion of the non-

---

[1] MetLife insists that its defense was not premised on Sharp's obligation to pay the premiums, but simply upon the fact that premiums had not been paid by someone. But counsel for Plaintiff, who was present at the settlement conference, has declared that MetLife did, in fact, lay the blame at Sharp's feet. The Court need not resolve this factual dispute in ruling on this motion.

payment of premiums defense. Counsel for Sharp contacted Mandell Menkes attorney Natalie Harris concerning the basis for MetLife's defense, and noted that there was no evidence in the Administrative Record that MetLife had relied upon Sharp's failure to pay premiums on behalf of Ms. Rudzinski in denying Plaintiff's claim. Subsequently, Ms. Rudzinski's attorney, Mr. DeBofsky, proposed that Plaintiff would voluntarily dismiss her claim against Sharp, if MetLife would affirm that it would no longer rely upon the non-payment of premiums defense. MetLife refused to withdraw the defense, and Sharp filed a Cross-Claim against MetLife, alleging breach of fiduciary duty, equitable estoppel, and a right to indemnification.

Sharp served written discovery on MetLife pertaining to the issues raised in the Cross-Claim. MetLife's Answers, which were signed by MetLife manager Laura Sullivan, indicated that MetLife had no documents supporting its non-payment of premiums defense. Ms. Sullivan conceded that MetLife's denial of Ms. Rudzinski's claim was not based upon Sharp's apparent failure to pay these premiums, and she testified[2] that MetLife would have denied Ms. Rudzinski's claim even if Sharp had made the payments. In

---

[2] In addition to signing MetLife's Answers, Ms. Sullivan was twice deposed by Sharp. In one of those depositions, Ms. Sullivan was presented as a Fed. R. Civ. P. 30(b)(6) witness. Mandell Menkes partners Brendan Healy instructed her not to answer questions regarding whether MetLife is pursuing a defense that Sharp failed to pay premiums on behalf of Ms. Rudzinski.

6

addition, MetLife was unable to identify any MetLife employee or officer with knowledge of the defense. Instead, MetLife identified Mandell Menkes attorneys Michael Rakov, Natalie Harris, and Steve Mandell as persons with knowledge.

Sharp also served a Fed. R. Civ. P. 30(b)(6) notice for a MetLife representative who could testify as to the basis for MetLife's Answers to the Amended Complaint concerning Sharp's non-payment of premiums. MetLife designated Mandell Menkes attorney Natalie Harris as its 30(b)(6) witness; at Ms. Harris' subsequent deposition, Mandell Menkes repeatedly instructed Ms. Harris not to answer questions concerning the formation of the defense.

On January 3, 2007, in a letter between MetLife and Ms. Rudzinski, MetLife agreed not to assert Sharp's nonpayment of premiums as a defense to Ms. Rudzinski's claims, but continued to reserve the right to assert such a position in defense of Sharp's cross-claim, on the ground that it constitutes a "good faith interpretation of the Plan." On January 4, 2007, Ms. Rudzinski moved to voluntarily dismiss Count II of her Amended Complaint, wherein she had alleged that Sharp had interfered with her ability to obtain benefits and misled her into applying for the Conversion Policy.

## DISCUSSION

In its Motion to Disqualify Mandell Menkes from representing MetLife, Sharp argues that disqualification is warranted because: 1) pursuant to Local Rule 83.51.7(b), there is an irreconcilable conflict between MetLife's interests and the interests of its attorneys over the spurious defenses raised by the Mandell firm concerning Sharp's nonpayment of premiums; and 2) pursuant to Local Rule 83.53.7, several attorneys from the Mandell firm will be called to testify as witnesses.

"Disqualification of an attorney is a drastic measure that should only be imposed when absolutely necessary." *Stopka v. Alliance of American Insurers*, No. 95 C 7487, 1996 WL 204324, at *2 (N.D. Ill. April 25, 1996). "A party is entitled to a degree of deference in the prerogative to proceed with counsel of its choice." *United States ex rel. Cericola v. Ben Franklin Bank*, No. 99 C 6311, 2003 WL 21476020, at *2 (N.D. Ill. June 23, 2003). Moreover, the "moving party bears the burden of establishing that disqualification is appropriate." *Ben Franklin Bank*, 2003 WL 21476020, at *2.

The moving party must establish more than the mere possibility that a conflict arise; there must be an actual conflict. *Philips Medical Systems Int'l B.V. v. Bruetman*, 8 F.3d 600, 606 (7th Cir. 1993). "The critical questions are the likelihood that a conflict will eventuate and, if it does,

8

whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." *Tizes v. Curico*, No. 94 C 7657, 1997 WL 116797, at *1 (N.D. Ill. Mar. 12, 1997) (citing Official Comment to Rule 1.7). And even where the moving party establishes the existence of a conflict, the client may, nevertheless, consent to the attorney's representation. *Id.*

Rule 1.7(b) of the Illinois Supreme Court's Rules of Professional Conduct instructs attorneys to refuse to represent a client if the representation may be materially limited by the lawyer's responsibilities to another client, to a third person, or by the lawyer's own interests. Sharp argues that Mandell Menkes' self interest in advancing the non-payment of premiums defense runs afoul of this Rule, as well as Local Rule 83.51.7(b), which is based upon the ABA Model Rules concerning conflicts of interest. L.R. 83.51.7(b) provides that:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interest, unless:
> 1) the lawyer reasonably believes the representation will not be adversely affected; and
> 2) the client consents after disclosure.

The committee notes to this rule explain that "Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client,

9

because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client." Comm. Comment L.R. 83.51.7(b).

In response to Sharp's charge, MetLife first notes that, as a third-party to the attorney-client relationship, Sharp does not have standing to bring this Motion. The issue of a third-party's standing to bring a motion to disqualify in a civil case has not been squarely addressed by the Seventh Circuit[3]. However, the First, Fourth, and Fifth Circuits have found that third parties have standing to bring a motion to disqualify. *Kevlik v. Goldstein*, 724 F.2d 844, 847-48 (1st Cir. 1984); *United States v. Clarkson*, 567 F.2d 270, 271 n.1 (4th Cir. 1977); *Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671, 673 (5th Cir. 1977). Similarly, in a criminal matter, the Second Circuit ruled that a third party who is in privy with the aggrieved client has standing to bring a motion to disqualify counsel. *U.S. v. Rogers*, 9 F.3d 1026, 1031 (2d Cir. 1993).

Moreover, the committee notes to Rule 1.7 state that "[r]esolving questions of conflicts of interest is primarily the responsibility of the lawyer undertaking the representation. In

---

[3] The Seventh Circuit has addressed the matter in the context of a criminal case. In *United States v. White*, 743 F.2d 488 (7th Cir. 1984), the Court considered whether the government had standing to bring an appeal of the denial of a motion to disqualify a defendant's counsel, because that counsel had previously represented a government witness in the case.

10

litigation, a court may realize the question where there is reason to infer that the lawyer has neglected the responsibility. . . . Where the conflict is such as to clearly call in question the fair or efficient administration of justice, *opposing counsel may properly raise the question*. Such an objection should be viewed with caution, however, for it can be misused as a technique for harassment."

District courts in this Circuit largely have embraced the language in the committee notes, and found that a third party has standing to move to disqualify opposing counsel only if it has "evidence clearly calling into question the fair or efficient administration of justice." *Tizes v. Curico*, 1997 WL 116797, at *2. *See also, Emmis Operating Co. v. CBS Radio, Inc.*, 480 F. Supp.2d 1111 S.D. Ind. 2007)(finding that the movant had demonstrated that the conflict would effect the fair administration of justice, thereby conferring standing on the third party to bring a motion to disqualify.) After reviewing the parties' briefs and the evidence, the Court cannot agree that the purported conflict between MetLife and Mandell Menkes rises to this level.

First, the Court does not agree that there is, in fact, a conflict between MetLife and Mandell Menkes that compromises Mandell Menkes' ability to zealously advocate on MetLife's behalf. Sharp argues that the conflict is palpable, noting that

11

MetLife manager Laura Sullivan testified that there were no documents or MetLife employees who could demonstrate that MetLife relied upon the nonpayment of premiums in denying Ms. Rudzinski's claim, whereas Mandell Menkes takes the opposite position. But Mandell Menkes does not, technically, take the opposite position. Mandell Menkes has not asserted, contrary to Ms. Sullivan's testimony, that there are documents demonstrating that MetLife relied upon this premise in denying Ms. Rudzinski's claim at the administrative level. Rather, Mandell Menkes argues that its non-payment of premiums defense is classic, hornbook insurance law, and that the defense is based upon a reasonable legal interpretation of the Plan. Perhaps Mandell Menkes' decision to raise the non-payment of premiums defense absent more concrete evidence of reliance at the administrative level was imprudent, *see Urbania v. Central States, Southeast and Southwest Areas Pension Fund*, 421 F.3d 580, 586-87 (7th Cir. 2005), but the Court fails to see how the strength (or weakness) of the defense constitutes evidence of a conflict between attorney and client. To the contrary, Ms. Amy Posner, in-house counsel for the MetLife Group, Inc., has stated that MetLife supports Mandell Menkes' representation and the defense.

Next, Sharp argues that Mandell Menkes must be disqualified, because one or more Mandell Menkes attorneys will be required to testify at trial. Local Rule 83.53.7 provides that if "a lawyer

12

knows or reasonably should know that the lawyer may be called as a witness other than on behalf of the client, the lawyer may act as an advocate in a trial or evidentiary proceeding unless the lawyer knows or reasonably should know that the lawyer's testimony is or may be prejudicial to the client." Disqualification under the "lawyer as witness rule" is warranted only if the moving party can demonstrate that the attorney's testimony is both essential and prejudicial. *See Tokh v. Water Tower Court Homeowners Assoc.*, 2006 WL 1648442, at *4 (N.D.Il.. 2006); *Bogosian v. Board of Educ. of Cmty. Unit Sch. Dist. 200*, 95 F.Supp.2d 874, 876 (N.D.Ill.2000).

In this case, Sharp has failed to demonstrate that the testimony of current Mandell Menkes attorneys would be prejudicial to MetLife, or would even be essential to resolving Sharp's claims. As an initial matter, MetLife states that it has no intention of calling any Mandell Menkes attorneys to testify at trial. While Sharp may seek to have Mandell Menkes attorneys testify at trial, these attorneys would be testifying "'other than on behalf of [their] client' and would be disqualified only if [they] expected [their] testimony to prejudice" MetLife. *Heim v. Signcraft Screenprint Inc.*, No. 01 C 50014, 2001 WL 1018228, at *2 (N.D. Ill. July 24, 2001). Because MetLife has represented to this Court that it understands and embraces the at-issue legal defense proffered by Mandell Menkes, and because

Mandell Menkes does not dispute Ms. Sullivan's testimony[4], the Court disagrees that such testimony, if required, will conflict with or be prejudicial to MetLife. *See Weeks v. Samsung Heavy Indust. Co., Ltd.*, 909 F. Supp. 582, 583 (N.D. Ill. 1996) (even if an attorney is required to testify, he should only be disqualified if he knows or reasonably should know that his testimony would be prejudicial to his client.)

In addition, the Court agrees with Mandell Menkes that, at this time, it is not apparent that there is a need for Sharp to call current Mandell Menkes attorneys to testify at trial. *Heim*, 2001 WL 1018228, at *2 (disqualification improper where witnesses other than the representing lawyer were available to supply the same information.) Should it become necessary for the Court to determine whether Mr. Rakov implicated Sharp in raising the non-payment of premiums defense, Ms. Rudzinski's attorney, Mr. DeBofsky, as well as Mr. Rakov are more than capable of testifying to these matters. The Court agrees that Ms. Harris' testimony would only serve to corroborate Mr. Rakov's testimony, and, therefore, is not essential. *See generally, Chapman*

---

[4] Notably, even Ms. Sullivan testified that the non-payment of premiums defense is based upon a reasonable interpretation of the Plan. And while Ms. Sullivan later claimed that there was evidence of premium non-payment within the administrative record, this is not contrary to her prior assertion that MetLife did not rely upon this as a basis for denying Plaintiff's claim at the administrative level. 4/9/07 Sullivan Dep. 120:21-23; 153:23-154:7, 156:10-12; 158:7-13.)

14

*Engineers Inc. v. Natural Gas Sales Co., Inc.*, 766 F. Supp. 949, 958 (D.Kan. 1991) (the court may "suspend its ruling until a determination is made if another witness could testify to those same matters.") The more likely scenario, however, is that MetLife would rely upon the testimony of Ms. Laura Sullivan, a MetLife manager, who has testified that the non-payment of premiums argument is a reasonable interpretation of the Plan.

In light of this, the Court denies Sharp's Motion to Disqualify Mandell Menkes. Sharp may ultimately demonstrate that MetLife's decision not only to raise, but to continue to advocate the non-payment of premiums defense was imprudent. But the merit of the defense is not dispositive of the issue at hand. Sharp's decision to attack MetLife's choice of counsel was an unusual, and extremely aggressive tactic that has come up short. Sharp has failed to show that disqualification is warranted, because Sharp has not demonstrated that Mandell Menkes' advocacy would be limited by competing interests; that the testimony of current firm attorneys will be essential to the resolution of this matter; or that such testimony would be prejudicial to MetLife.

## CONCLUSION

Disqualifying Mandell Menkes would deprive MetLife of a lawyer with substantial knowledge of and involvement in the background of this case. Requiring MetLife to retain new counsel to perform work that most likely would duplicate Mandell Menkes' efforts would impose a significant financial burden on MetLife. *Weeks*, 909 F. Supp. at 585. Because Sharp has not presented a compelling case to justify depriving MetLife of its selected attorney, the Court finds that disqualifying Mandell Menkes would only unfairly prejudice MetLife. Therefore, Sharp's Motion to Disqualify is DENIED.

DATE: October 25, 2007     E N T E R E D:

_____
ARLANDER KEYS
United States Magistrate Judge